Good morning, Your Honors. May it please the Court, Irena Vasilchenko from Labatton-Kellers-Suchero on behalf of the Plaintiffs' Appellants. The District Court's 12B6 dismissal of the Securities Fraud Class action under Sections 10B of the Exchange Act for failures to plead material misstatements and omission was an error and should be reversed on de novo review. The case against Teladoc, a telehealth company, and its senior executives arises out of defendants' failure to integrate one of Teladoc's key competitors, Livongo, another telehealth company that Teladoc acquired in October of 2020 for a whopping $18.5 billion. This acquisition was essential for Teladoc's ability to provide the comprehensive, whole-person telecare products that defendants repeatedly touted investors as its key competitive advantage. Thus, the successful integration of Livongo and Teladoc was crucial to Teladoc's financial success going forward. Can I go through some of the statements with you? Sure. I'll be putting aside the two statements where there's a discussion of full integration and the other one about tech sacks. The ones where they say things like, it's going great, it's well on its way, continuing to progress, on track, why aren't those classic opinion, puffery, corporate optimism, why should the District Court determine those were not actionable? Why is that wrong? Sure, Your Honor. So under this Court's precedent, specifically the Novak and Kosek case, as well as the more recent Celestica case. Novak, you took a few quotes from Novak where there was in good shape and under control with respect to inventory, but then there were more specific statements about no major unusual markdowns were anticipated. Where it was inventory, 10% to 34% that was supposed to mark it down under the accounting rules and they didn't. So that was a very specific, quantifiable thing that does not exist when you have these types of terms. I know it's not binding, but the NRA level three communications case, the Tenth Circuit case, said broad claims by defendants regarding integration efforts are non-actionable, progressing well, tracking with expectations. You know, it then set aside some other statements, but isn't that the right line? No, Your Honor. Actually, the level three case that you just pointed me to actually upheld similar statements. Other statements. The other statements that were more of the fully integrated type statements, but the ones that you're also challenging, it said no, progressing well, beginning to see benefits, tracking with expectations. The Tenth Circuit said those are non-actionable. So I believe level three also upheld a statement that said that things were going ahead of plan, which is very similar to the statements that we have here, including the on-track statement by Defendant Gorovitch. We also have the Celestica case by this court that was more recent, and that actually upheld a statement that's very similar, which is that the restructuring was going according to plan. And we believe that we fall squarely within this line of precedent because the defendants were talking about specific important areas of the integration, like the product platform. The Celestica case also dealt with inventory as well. We had the same issue that Novak had, where inventory is a very quantifiable thing, and they were making specific statements about levels of inventory that were potentially false. And you don't have that when you're talking about integration. That's a pretty amorphous term to begin with. If you're just talking in general, that it's progressing well. Like, how would we know what's false or not false? How can an investor put any reliance on something like that? Well, for example, if you look at Defendant Gorovitch... How much integration do you have to be going well? What percentage of integration do you have to have to be going well? I think, Your Honor, if you look at some of those misstatements in a bit further context, the defendants then provide a little bit more specificity as to what exactly they're talking about. Like the one that you're talking about, Defendant Gorovitch's misstatements about progress of the data platforms. He then gives an example of how they've integrated the blood glucose data from Livongo into providing such services to Teladoc's customers. And one of the CWs specifically talked about how that specific glucose meter data had not actually been integrated, and that was not available during that CW's time at the company. So maybe I'll ask the question this way. And I know that you're not going to concede anything. But if you were to help us for argument in listing the two or three things you thought were the most clearly actionable of all of your allegations, not conceding them, which two would it be? I would say the first two misstatements that talked about how the sales team's integration was complete. So the... Fully integrated. ...February and April 2021 statements? Yes, our commercial organization is now fully integrated and our teams responsible for cross-selling have been collaborating for months. That's in February of 2021. And then in April of 2021, Gorovitch again gives an update on integration and says we've made considerable progress across our key work streams. So those are the two that you think are your strongest? Yes, the fully integrated ones. There's also one in an October 2021 analyst report, the Credit Suisse analyst reports, where the analyst specifically asked Teladoc, we've heard some concerns that Teladoc might be slightly behind schedule on the integration. And then management pushed back on the idea that Teladoc was behind schedule on the integration and assured that it was not. So I believe that's actually very similar to a misstatement that your Honor... Where did the 2020... I'm sorry, where did the 10K statements? The 10K statements are the risk warning misstatements that were issued in March of 2021, was the first 10K. And then March 2020... No, where... I'm sorry. Where do they fit in into your strength? Like, are they at the top? Are they at the bottom? Are they in the middle? Like, when... I would say they're not our top misstatements, but I believe they're also squarely actionable under this court's precedent in the Credit Suisse case, for example, which says that when you warn of potential difficulties, potential problems, and you know that those problems have actually already materialized, that is misleading under the securities law. Okay. So then, if being that you were listing those two Gorbik statements, can you talk to us about how we know what full integration means? Like, how is it not vague? How do we know whether or not it's material? Sure, your Honor. Well, if you look at the plain meaning of the word, looking at the Merriam-Webster dictionary meaning of the word, it says that to integrate something is to fully blend into one functioning cohesive whole. And if you look at the multiple CW allegations here, which are corroborated by internal documents and the Business Insider article that was the first corrective disclosure, here the sales teams were not operating in unison and together. In fact, they were all still running separately. This is according to three separate CWs. It was backed up by internal documents and the Business Insider article that I mentioned. They were not selling the company's combined products. In fact, the Livongo teams were still selling only Livongo products, which is directly contrary to Defendant Gorovitch's April misstatement, where he said that the teams have been fully integrated with the sales team selling across the entire whole person portfolio products since early this year. According to CW2, CW1, and various other CWs. Do you allege that there was a deadline for full integration that was not met? I don't believe we allege there was a deadline, but defendants represented two investors that the sales teams had been fully integrated as of February 2021 and April 2021. But if there wasn't a deadline, then how can it be actionable? Because there was nothing missed. Well, according to defendants' own words, they had completed the integration of the sales teams, at least as of February and April 2021. And that was demonstrably not the case, because CW5, who was on a team responsible for integrating the sales teams, said that the integration of the sales teams was not yet complete by the time she left, which was in June of 2021, two months after Defendant Gorovitch's last misstatement. What about the full context of that statement? The commercial organizations now fully integrated and our teams responsible for cross-selling have been collaborating for months. And then the information that follows, I think, sort of are examples of that collaboration. Isn't the context of that that there has been collaboration for months in that meaning of integration? Sure, Your Honor. I think you're referring to Gorovitch mentioning how they hosted an annual global growth summit, bringing together over 700 salespeople for one internal meeting. I don't believe that one sales meeting where everybody got together in one room and talked for a few hours shows that the teams are fully integrated, i.e., functioning as one team. But do you have allegations that contradict that the teams responsible for cross-selling have been collaborating for months? Yes, we do have CW2, for example, giving a lot of detailed allegations about how there was no such overlap and synergies between the teams from Livongo and Teladoc actually selling together and cross-selling each other's products. He repeatedly said that, in fact, his Livongo sales team was still selling only Livongo products all the way to Canada. Would it be true while still collaborating with each other and integrating? I mean, I guess it goes back to the, I think, fundamental question as to whether integration is a definite, verifiable term that we can look at and objectively determine one can, so that a reasonable investor reading this would say, okay, they've gotten to this thing that we all agree would have happened, contradicted by the allegations of the CW. I do believe that you can look at the word integrate based on the ordinary meaning of functioning as one team, and that was not the case here. So if two people, if it's a big team and two people don't get along, one from Livongo and one from Teladoc, does that mean they're not fully integrated? No, and that's not what we're arguing about. We're not alleging that just kind of, you know, the regular old discord or contention between the two teams is what's at issue here. The issue is here that CW2 gave concrete examples of how his Livongo team was not yet blended into the Teladoc larger team. He has internal documents showing that they were cut off, put on an island, told to stay out of Teladoc's swim lane. Those are not the kind of integration and blending of the teams that the statement fully integrate conveys to investors. And whether or not he's... I mean, those things, I guess at base, if what it means to be fully integrated is an opinion, then those things are, those kinds of arguments would support a different opinion as to full integration versus another. So I'm not sure you get to those unless you've persuaded that full integration isn't an opinion. Well, even under, even if it's considered an opinion, and there are no opinion qualifiers preceding that statement, which under Omnicare and this Court's decision in DiCarlo is an important thing to look at whether or not... Not necessary, but important. Not necessary, yes. And there were no such opinion qualifiers here, first of all. Second of all, even if it's an opinion under Omnicare and DiCarlo, omissions of material facts are equally misleading if they create a false impression in a reasonable investor's eyes. And here, defendants repeatedly assure that at least this one specific aspect of the integration has been completed, right? They checked off an important mark on their checklist of integration processes. The sales teams are fully integrated. There were also analyst reports that actually reported on Gorevich misstatements and were positively reassured that, you know, the integration of Livongo is off to a great start with the sales teams being fully integrated. So the fact that sophisticated securities analysts were reporting on defendants' misstatements certainly supports their materiality and makes them not just... I think we have the argument. Thank you, Your Honor. I observe your two minutes rebuttal. Thanks. And Ms. Soloway. Yes, thank you, Your Honor. Audra Soloway from Paul Weiss for the Defendants at Police. As Your Honors are well aware, this case arises from the enormous challenge of integrating two multibillion-dollar companies, and much less at the height of the COVID-19 pandemic. What the plaintiff is trying to do here is recast as securities fraud a series of interim updates and optimistic statements by management about the progress of that integration. But Ms. Soloway, if you say something is fully integrated, put aside again the ones in progress, doing well, going great. You say something is fully integrated. Why isn't that a statement of certainty on a particular part of the business, the sales organization? It seems like we'd be going contrary to what the Tenth Circuit said in that NRA Level 3 case, which you cite, where they disagreed with the district court where one of the statements was that physical integration is now complete. And they said, we disagree with the district court that these were merely aspirational statements. Each of these statements could have and should have had some basis in objective and verifiable fact. Yes, Your Honor. And in fact, the district court here didn't decide that statement on that ground. The district court didn't say that's opinion, that's non-actionable. The district court said that they did not sufficiently allege that it was plausibly false. So the district court did not conclude that it was non-actionable. I think maybe there's some room for interpretation here, Your Honor. But I actually think the district court did conclude it was opinion. She should have said everything's opinion, but I'm going to focus on these four. Exactly. And I think where she immediately goes is she says, look, there's a group of CWs here who have formed a view. Their view is that it's not fully integrated, the commercial organization. And she says a disagreement of opinion between these CWs and the management about what is fully integrated doesn't give rights. On the issue of falsity, they gave very specific examples, some of which you just heard here, of why these sales teams were not fully integrated. It wasn't just this general view, I disagree with the company, I think they weren't integrated. They gave very specific examples, very high-level people who were in the positions related to sales. I understood, Your Honor. So I think there's three problems here. I'm going to take that one first. That goes to falsity. Have the plaintiffs actually found allegations from these CWs or adduced allegations from these CWs that show that the statement is false? And I think the first issue is what does it mean to integrate versus all of the so-called problems that these CWs have identified? So a CW who says, well, there was a disagreement of opinion on my team about what the strategy should be. Kelly said this and Joe said that. That doesn't mean that the team isn't integrated. That means that the team has some, you know, business judgments that they have to make. It doesn't mean that there isn't integration. Similarly, if one CW is- But isn't that a question for a later part of the proceedings? I mean, we are at a motion to dismiss, and there is a higher standard, but it's not a higher standard of proof. It's a higher standard of specificity. So why wasn't that at least a plausible allegation? Because I think here, if you take all of the allegations as true, and I am. I'm taking all of the CW allegations as true. Let's get some of the more specific ones. CW7 said she worked on a team that focused exclusively on Levanville products when she left in October 21. So that suggests, at least on the products that she was involved in, no integration at all. Two separate teams, right? So why isn't that help support that it was false that the company was fully graded in its commercial organization? Okay, so I think the first problem is that a bare allegation that a particular team is siloed or hasn't been integrated doesn't tell you whether the commercial organization at large has been integrated. I'll give you an example, Your Honor. I work at Paul Weiss. I'm on the securities litigation team at Paul Weiss. If Paul Weiss merged with another law firm that didn't have a securities litigation team, presumably my group would just continue on business as usual. There may be nothing that needs to happen to my particular team in order to so-called integrate us with another team, whereas there may be other teams where there's crossover between their purposes where you might say, all right, the only way to integrate these teams is to actually join them and combine them and put one person in charge and have them move forward. So the fact that one team is siloed, according to a CW, doesn't mean— a lack of one person talking, that there's massive structural lack of integration. And these are just examples of that. So maybe as Judge Pettit has suggested, maybe in discovery, what you're suggesting, the Paul Weiss example might turn out to be true with respect to what CW 7 says, but maybe it won't be. And they have CW 2 who—and some documents that suggest that, again, sales teams are being told not to work with each other, stay out of each other's swim lanes. Again, very particular examples of what was going on. So I think, again, if a salesperson is having conflict with another salesperson and one is saying, stay out of my swim lane, that is the routine challenges of running a business. That doesn't go to whether that team has actually been integrated with another team. I don't think any reasonable investor who hears that the sales organization has been integrated will assume that that means that every former Teladoc employee has perfect knowledge of the Livongo products or that every Livongo employee has perfect knowledge of the Teladoc products. It means that they took the organizations, they restructured them, they appointed new leadership, and they instructed them to move forward. But one of the statements that she thinks is one of her strongest is that the commercial organization is fully integrated and the cross-sellings have been collaborating. So at the very least, there are some people working together and the commercial aspect of it is integrated. Right? I mean, is that not fair? I don't think the plaintiffs actually challenge any of the underlying facts that support that statement. So, for example, that 700 people got together for a conference or that they're now cross-selling each other's products. The plaintiffs don't have a CW who says they're not cross-selling. And, in fact, CW2, who they rely on, says, we went to a hospital together. She tells an anecdote. We went to a hospital together and the people selling Livongo products met with one team and the people selling— But she's saying the businesses were still running separately. But when she gives an actual factual example of going to a hospital, she says— Look, that's a muddy fact scenario, right? And so the question, again, is what was plausibly alleged at this stage? And so I'm just—my question—one of the things I'm struggling with is, like, how finding for you would not be upping the pleading standard. So maybe I'll ask you directly. Like, why aren't—what is being alleged, but the ones that she said were the strongest, which were Gorevic's two statements that we mentioned, why does that not heighten the pleading standard? So I think it doesn't heighten the pleading standard because we are assuming all pleaded facts are true. And so the question here is, is fully integrated an opinion? And I think here there's no allegation that Mr. Gorevic, when he spoke, didn't honestly hold the opinion that these organizations were fully integrated. And so if you assume all of the facts is true and this is an opinion, what does it mean to fully integrate an organization, and he honestly holds this opinion is true, then the fact that junior-level people—all of the CWs are very junior people. They don't report to Mr. Gorevic. They don't even report to the person who reports to Mr. Gorevic. The fact that they're making observations where they're saying, well— So your argument would be, Ms. Ali, even if there was zero integration, companies continue to function completely separately, that that would be an opinion that would be non-actionable even if there was zero integration? So I think that's actually a different situation because if you— If it's non-actionable, it's non-actionable, right? If it's puffery, it's non-actionable. It doesn't matter what level of integration there is, right? So let me explain. I think if it's an opinion but there was absolutely no integration going on, then I think the inference you can take from the opinion that the two sales organizations have been fully integrated is that there is at least some integration that's gone on, and Mr. Gorevic's view is that that's full. But if there's zero, then I think it doesn't work at all. Let me go back to your Paul Weiss example because CW1 said that he or she was responsible for client retention and sales and said that her ex-Lobongo team was still operating separately when she left in January 2022. So I don't think you could say client retention and sales is unique to one— one might have that the other might not have. So why isn't a complete lack of integration on client retention and sales, again, some indication that this was not a fully integrated entity? Well, I think the first question you have to ask is who is CW1 and what does CW1 actually know? I mean, paragraph 50— The Senior Client Success Associate. Right. A Senior Client Success Associate tells us absolutely nothing about what level of hierarchy that this particular CW sits in. We need to know all that at the pleading stage? I think in order to— To assess whether, like, the significance—I mean, I think what you're saying doctrinally is if the assertion is full integration, assuming that's an opinion, and the fact asserted—the counterfact asserted was there was no integration, exclusion of that information would make the opinion misleading. You've conceded. So then the question is why are some facts of failed integration or not yet realized integration, when do those cross over into being significant enough to make the full integration opinion misleading? And you're saying, well, we need to know things like what the level of seniority is for the person making the assertion, how widespread it is. Well, that starts tipping—I think starts tipping over into moving away from all inferences being in the plaintiff's favor and plausibility as the standard into something else, maybe more like a genuine issue. Well, look, I think at the very least the plaintiff should be in a position to allege or their CW should be in a position to allege that they had some understanding of what the integration plan actually was. I mean, if you're saying— What authority do you derive that from? Well, I think it goes to the question of whether—I think it goes to the doctrine about opinion, and in fact I think the issue of full or part and the DiCarlo case kind of embraces this also from the circuit. If you say—and DiCarlo is a case about gap and subjective judgments, and in that case it was—the court agreed that it was an opinion, but because there was absolutely zero historical data on which you could make the gap judgment, this court held, well, if there's zero historical data, even though the historical data in and of itself is a subjective judgment, if it doesn't exist at all, then I think it infers—and the statement infers that there is the existence of such data, then the statement can be false. But if you're in a place where the plaintiff has not pleaded that there wasn't some integration, and in fact the plaintiff concedes there was much integration because they're talking about teams that have been combined where there's differences of opinion, they're talking about hospital visits where the teams are going together and dividing and conquering once they get there, so we know that there are some integration efforts going on, then the question is, well, what did Mr. Gorevic mean when he said the sales teams have been fully integrated? Now, presumably he had a plan. None of these CWs know what that plan is. His plan may have been we're going to take team A, B, C, and D, and we're going to combine A and C, and we're going to leave B functioning by themselves, and none of these CWs have any idea what the plan is. So when they say, in my view, it wasn't fully integrated, they're basing that on not even knowing what Mr. Gorevic's plan was, much less do they have any insight into his impression of whether there's been a full integration. But CW2 was a sales vice president, and isn't that person in a position to understand what the plan is? No? No. No, Your Honor. I mean, candidly, I think most employees at organizations like this have a vice president title. All right. It is not a sign of seniority. I'm not going to let you sit down before I ask you about tech stacks. Tech stacks. Okay. Fair enough. So there's a statement that said that there's been integration of the legacy, Livongo, and Teladoc marketing data and tech stacks, and they have a CW11 who says to populate these tech stacks, you need this program, Tableau. Tableau. Tableau. Which they did not have at the time, so that it was impossible to integrate the tech stacks with the data that would be necessary, the client data. So, again, why isn't that a particular statement about a particular part of the companies that could prove to be false? Wouldn't that statement be false if, in fact, you couldn't populate any of the information into the system? So, Your Honor, maybe let's just get a baseline setting on what the factual allegation is. Okay. So Tableau is described by CW11 as a software product that would actually pull data from central data locations, and then it would allow the non-tech savvy people who are using it to create visual images, so charts and graphs and other things that could potentially be used in materials. It was not, in and of itself, the data. It pulled data from other places. And what CW11 said is that this piece of software, if you wanted to use it, you had to be able to pull data separately, historical legacy data. You had to pull the data down separately from Livongo and from Teladoc. That does not mean that the tech and data stacks hadn't been integrated. The tech and data stacks, Your Honor, are described in the complaint as being sort of a capability to do these blast emails and blast text messages to clients, and there's no allegation in the complaint that Teladoc lacked the ability to send out these blast messages. And, in fact, if you look at it, it's Ms. Verstraete who made the point at Investor Day about the tech stacks being brought together and integrated. And note, she doesn't say fully integrated. She says brought together and integrated as we've deepened our capabilities. And she goes on to say that this allows us to reach members given any given service configuration, which I think supports the proposition that this is really about being able to send those email blasts or those text blasts. And so what Judge Cote held below is that precision matters. The data that is being drawn that's being used to send these text and email blasts isn't alleged not to have been integrated, but rather the plaintiffs are saying that this one software program tableau that allows the sales team to create charts and graphs, you have to get the data from two different places if you want to use that software program. And she says that that's not enough. Your explanation, is that in the complaint about charts and graphs? It's in the complaint. Let me see if I can find the paragraph for you. I think it's in paragraph 121, Your Honor. All right. I'll take a look. I didn't. Just one more point, and then I will wrap. Well, I've got a question, too. Yes. Please. If we end up deciding to vacate as to some statements, do you believe that we should consider a Santer or loss causation, or should we remand for the district court to consider them? I think it's really in this panel's discretion to remand and have Judge Cote address both of those. She obviously did not address either of them below. I do think that here, if we're talking about the two statements that we've been talking about today, and that largely is Mr. Gorevic's statement about full integration, I would point out that the Sienter allegations as to Mr. Gorevic are incredibly thin. I mean, as I mentioned before, none of the CWs are alleged to have worked for him, talked to him. They have absolutely no idea what he, in fact, himself knew. And the idea that, you know, you can plead his intent to defraud from a statement that even the plaintiffs, I think, have acknowledged during argument has some fuzziness to it is, I think, that would take it to a whole other standard, right, in order to plead and prove his Sienter for making that statement, having not identified a single fact known to him. Here, the plaintiffs focus on, you know, I think with respect to Mr. Gorevic in particular, and this is in paragraph 517 of the complaint, they focus on an email exchange where he's talking pre-merger with a client, Montefiore, about building some capability to develop some product. And the plaintiff sees on that, and they say, ah, he knew that the capability didn't exist. This is pre-integration even happening, and it has nothing to do with whether the sales organization has been fully integrated. So I think there is a real Sienter problem. There's also a real loss causation problem. The three corrective disclosures never revealed that the sales organization wasn't fully integrated. And, in fact, if you look at the Business Insider article, it says that there was a January 1st deadline for the department in charge of client operations to fully combine, and there's nothing in the article that says that they didn't combine. It said they faced challenges, but it doesn't say that they didn't combine, and that's at A656 in the record. All right. Thank you. May I? Yes, please. I know they weren't highlighted in your opponent's argument, but the 10K risk statements, you can't insulate actual problems by phrasing them in risk statements, can you? You can't say at a 10K, for example, we're at risk of government investigation and enforcement proceedings if you're, in fact, currently facing enforcement proceedings, can you? So I think the answer to that depends on the context of the statement. I mean, here, most of the risk disclosures that the plaintiffs have pointed to are early in the process. They say that we may have difficulty obtaining the synergies from this transaction or integrating the businesses over time. And I think in the context of- One of them is potential difficulties that Teladoc may encounter in the integration process. So that's the last of the four, Your Honor. And I think here what we would say is I don't think any reasonable investor who reads this statement and says potential difficulties Teladoc may encounter would conclude that from that laundry list of difficulties that you can then conclude that every team is sinking completely, that there's no confusion among the sales force about product offerings, that there might be one piece of software that hasn't been properly integrated. These are not representations as to specific things, and I don't think any reasonable investor would read these types of risk disclosures and say, oh, that must mean that every employee is getting along with every other employee and that this transition between the two teams- I mean, I guess just to take one example, the retention of key employees. So let's say there were allegations that key employees had left, and it's phrased simply as there's a risk of that occurring. Right. Would that be actionable? So I think in this context, I don't think it would be because I think if you're saying there is a risk of key employees leaving, and that is an ongoing risk that has gone from day one of the integration and is going to go years into the future when the integration is completed, I don't think a reasonable investor would understand that to mean- and that means this has never happened. No key employee has left. The Omaha case, though, came out the other way on that. That was exactly the situation in the Omaha case, right? There was key people in the integration staff had left, and the district court said that is actionable. Well, I think the facts in that case were also somewhat different. I think in that case, the company had also made statements to the effect of they were continuing to invest in their workforce and statements of that kind when, in fact, 600 people had either been fired or had been forced out by plans that required them to leave. So I think the facts were somewhat different in that case. All right. Thank you, Ms. Holloway. Ms. Vasilchenko, you have two minutes in rebuttal. I'll try to be brief. I would just like to address a couple of points that my opponent mentioned. With respect to CNTR and the fact that none of the CWs here had any direct interactions with the individual defendants, including Gorovitch, that's wrong. CW4, who was a senior leader in the clinical team, spoke directly to Gorovitch in September 2021 at our senior leadership meeting in Chicago, Illinois. And in that conversation, Gorovitch acknowledged to CW4 that, essentially, they still haven't had a real integration plan and that he was going to unveil one tomorrow at his presentation. And that CW4, the next day, was, again, left very disappointed by this long-delayed plan that they finally disclosed. So that's CW4 and Gorovitch. We also have CW2 talking directly to the chief operating officer, David Sides, who reported directly to Gorovitch. And he actually, Sides, was also the head of the global commercial organization that was supposedly fully integrated. And in June of 2021, CW2 talked to COO Sides at a Nashville, Tennessee meeting, where, again, CW2 asked Sides, you know, the elephant in the room, what is the integration plan for Livongo? And Sides acknowledged, I don't know, effectively admitting that, you know, eight months into the integration, they still didn't have a real plan. So that really rebuts my opponent's statement that they might have had a plan or, you know, this low-level CWs really didn't know whether or not the senior executives had a plan. Can I ask, just on the full integration statements that we started with, if I want to look to the complaint for allegations that tell me what full integration means or what a reasonable investor would conclude full integration means, what allegations would you point me to? I would point again to how the CWs described the fact that the sales teams were not fully integrated, meaning that the teams were still running separately. Because full integration, when you're talking about personnel teams, conveys that they're functioning cohesively together as one team. And when they're still siloed, running separately, cut off and put on an island and excluded from Teladoc sales meetings and are not selling Teladoc products, they're still selling only exclusively Livongo products, that is not functioning as a fully integrated, unified team. And that's the ordinary plain meaning of the word integrate, right? And the fact that the marketing statement that Your Honor actually pointed out, I think that's another good example where they concretely told investors that something in the integration had been actively completed. And that was that their marketing data and tech stacks had been integrated. And my opponent pointed out, well, that didn't have the word fully in front of integrated. It just said integrated. But if you look at the definition meaning of integrate, it means that it has been unified, brought together to function as one whole. The marketing data and tech stacks were not fully integrated by that point because, as Your Honor pointed out, the Tableau database, which is a key marketing data analysis platform, which is actually an example of a tech stack. If you Google the word marketing tech stack, Tableau is one of the examples that comes up. And CW11 pointed out that tech stacks refers to technological tools that help the company market its products better and gave one example of email blacks and text messages to a potential customer. So it's an example that's not the only thing that tech stacks do. Tableau is a key example of a marketing tech stack because it helps companies analyze customer and patient data to help them send out future marketing campaigns. So that's another concrete example of one of the aspects of the integration that was not completed. With respect to my opponent's comment that these were just routine, minor, little problems, I would point, Your Honor, to the fact that on the two final corrective disclosure dates, Teladoc recognized massive, multibillion-dollar goodwill impairments, $9.5 billion total, which was essentially half of what Teladoc had paid for Livongo, $18.5 billion. So these were not just minor, little problems that happen to every company that's integrating a new acquisition. These were major problems, as defendants admitted at the end of the class period. They admitted that they had not yet, two years later almost, they still had not fully integrated Livongo's products into Teladoc's platforms. I see I'm out of time. Thank you, Your Honor.